<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

MELINDA BAIR,                      )
                                   )   Civil Action
            Plaintiff              )   No. 09-cv-00549
                                   )
      vs.                          )
                                   )
LIFE INSURANCE COMPANY OF          )
NORTH AMERICA,                     )
                                   )
            Defendant              )

                        *    *    *

APPEARANCES:

            KIRK L. WOLGEMUTH, ESQUIRE
                  On behalf of Plaintiff

            BRADEN BORGER, ESQUIRE
            JAMES A. KELLER, ESQUIRE
                  On behalf of Defendant


                        *    *    *


                  <u>O P I N I O N</u>

JAMES KNOLL GARDNER,
United States District Judge

            This matter is before the court on defendant's oral
motion for judgment on partial findings made on the record on
July 7, 2011, the first day of the non-jury trial of this matter.
Also before the court is defendant's Statement of Objection to
the Admissibility of Any Evidence Beyond the Administrative
Record of Defendant Life Insurance Company of North America
(Document 82), which argues that no evidence should be admitted
at trial other than the jointly filed Administrative Record.

For the following reasons, I overrule defendant's objection to admissibility of evidence beyond the Administrative Record of this matter.  I grant defendant's motion for judgment on partial findings, and I enter judgment in favor of defendant Life Insurance Company of North America ("LINA") and against plaintiff Melinda Bair.

## JURISDICTION

Jurisdiction in this case is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because the events giving rise to plaintiffs' claims allegedly occurred in Elizabethtown, Lancaster County, Pennsylvania, which is within this judicial district.

## PROCEDURAL HISTORY

Plaintiff initiated this action on February 9, 2009 by filing a one-count civil Complaint against the Mars, Inc. Long-Term Disability Benefits Plan.  The Complaint alleges that plaintiff was previously employed by Mars, Inc. but that, because she suffers from bi-polar disorder, major depressive disorder, paranoid delusions and suicidal ideations, she was unable to work.

The gravamen of plaintiff's Claim for Disability Benefits Under 29 U.S.C. § 1132(a)(1)(B) is that the

-2-

administrator of her former employer's long-term disability plan denied plaintiff long-term disability benefits to which she was entitled, in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").

By Stipulation and my Order dated June 2, 2009, LINA was substituted as the defendant in this action, in place of defendant Mars, Inc. Long-Term Disability Benefits Plan (the "Plan"), and the Plan was dismissed as a party to this action. Previously, on April 9, 2009, LINA had filed its Answer and Affirmative Defenses of Defendant Life Insurance Company of North America in response to the Complaint.

As discussed more fully below, on July 29, 2009 United States Magistrate Judge Henry S. Perkin issued an order on defendant's motion for clarification of Magistrate Judge Perkin's prior June 25, 2009 Order granting plaintiff's motion to compel the deposition of defendant's Appeal Claim Manager, Patty Ursiny.[1]  Specifically, by his July 29, 2009 Order, Magistrate Judge Perkin limited the deposition of Ms. Ursiny to four specific alleged procedural irregularities.[2]

---

[1]     By my Standing Order dated March 19, 2007, all discovery disputes which cannot be amicably resolved are referred to Magistrate Judge Perkin for disposition.

[2]     The four specific alleged irregularities articulated in Magistrate Judge Perkin's July 29, 2009 Order are (1) defendant's reliance on the medical evidence; (2) defendant's alleged failure to explain the rejection of plaintiff's medical evidence; (3) defendant's alleged failure to review plaintiff's job duties and whether she could perform the job with her restrictions; and (4) defendant's alleged failure to acknowledge that plaintiff's employer would not accommodate her restrictions.

Defendant filed a motion for reconsideration of Magistrate Judge Perkin's July 29, 2009 Order. After oral argument, and by Order dated September 20, 2009, I granted the motion in part, and remanded the issue to Magistrate Judge Perkin for a determination of the applicable scope of review in this ERISA matter, and the impact of that scope of review on the discovery dispute at issue.

On November 20, 2009, Magistrate Judge Perkin issued an Order and Memorandum which concluded that this court should consider the matter under a de novo standard of review. Neither party objected to this conclusion. Accordingly, as discussed below, my review of this case is de novo.

The parties filed cross-motions for summary judgment. On May 28, 2010, the parties filed a joint administrative record in this matter which, pursuant to Order of Magistrate Judge Perkin dated May 20, 2010, is filed under seal.[3] On August 23, 2010, I conducted oral argument on the parties' cross-motions for summary judgment, and took the matter under advisement.

By Order dated March 18, 2011, I denied both motions for summary judgment. Specifically, I concluded that there were genuine issues of material fact which precluded entry of summary judgment in favor of either party, including but not limited to

---

[3] The parties' motions, briefs, and statements of undisputed facts and responses thereto contain citations to this joint administrative record. The pages contain Bates numbers labeled "LINABAIR ___", which is how references to the administrative record appear in this Opinion.

why plaintiff did not return to work in August or September 2008 and whether plaintiff's inability to work with her manager and coworkers was caused by her disability.

The parties appeared before me on July 7, 2011 and July 19, 2011 for a two-day non-jury trial. Prior to trial, on June 14, 2011, defendant filed a Statement of Objection to the Admissibility of Any Evidence Beyond the Administrative Record of Defendant Life Insurance Company of North America (Document 82), arguing that no evidence should be admitted at trial other than the jointly filed Administrative Record.

On the first day of trial, I heard oral argument on the objection and took the issue under advisement, and permitted the parties to present evidence beyond the Administrative Record subject to my later ruling, in this Opinion, on the objection. In her case-in-chief, plaintiff Melinda Bair testified, and one document was offered into evidence in addition to excerpted deposition testimony of Ms. Ursiny.

At the close of plaintiff's case-in-chief on the first day of trial, defendant made a motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. On the second day of trial, I heard oral argument on defendant's motion and deferred my ruling on it until after the close of evidence, as permitted by Rule 52(c). Defendant's case-in-chief consisted solely of additional excerpts from Ms.

Ursiny's deposition which had been counter-designated by defendant.

Accordingly, the issues before the court for purposes of this Opinion are defendant's objection to admission of evidence beyond the Administrative Record, defendant's motion for judgment on partial findings, and adjudication of the non-jury trial.  Hence this Adjudication.

<u>STANDARD OF REVIEW</u>

ERISA provides that a plan participant may bring a civil action "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."  29 U.S.C. § 1132(a)(1)(B).  Ordinarily, courts conduct a <u>de novo</u> review of a company's denial of benefits under ERISA unless the benefit plan grants the plan administrator discretionary authority to construe terms of the plan, in which case courts review the denial of benefits under an arbitrary and capricious standard.  <u>Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley</u>, 248 F.3d 206, 216 (3d Cir. 2001).

Where, as here, the policy at issue requires plaintiff to provide "satisfactory proof" of disability before benefits will be paid and "continued proof" of disability for benefits to continue, the policy administrator (here, LINA) does not have discretionary authority to determine eligibility for benefits.

See Adams v. Life Insurance Company of North America, 2009 WL
2394150, at *6 (E.D.Pa. Aug. 3, 2009)(Padova, S.J.); Farina v.
Temple University Health System Long Term Disability Plan, 2009
WL 1172705, at *11-13 (E.D.Pa. Apr. 28, 2009)(Schiller, J.).[4]
In such cases, as here, the standard of review is de novo.[5]

De novo review means that this court's inquiry is not
limited to, or constricted by, the administrative record, nor is
the plan administrator's decision due any deference.  Luby v.
Teamsters Health, Welfare and Pension Trust Funds, 944 F.2d 1176,

---

[4]    At the August 14, 2009 oral argument before me on defendant's
motion to reconsider Magistrate Judge Perkin's July 29, 2009 discovery order,
plaintiff argued, for the first time, that Adams and Farina are applicable to
this case.  Because the United States Court of Appeals for the Third Circuit
had not ruled on this scope of review issue, I concluded in my September 20,
2009 remand order that the Adams and Farina decisions issued in this judicial
district did not constitute a change in controlling law for purposes of
reconsideration.  Brunson Communications Inc. v. Arbitron, Inc., 246 F.Supp.2d
446-447 (E.D.Pa. 2003).  Therefore, I declined to reverse Magistrate Judge
Perkin's July 29, 2009 Order regarding the scope of Ms. Ursiny's deposition.

However, I concluded that Adams and Farina may be persuasive
authority which Magistrate Judge Perkin should be permitted to review and
consider.  Thus, and because by my Standing Order all discovery issues are
referred to him in the first instance, as discussed above, I remanded the
matter to Magistrate Judge Perkin for consideration of the applicable scope of
review and its effect on the discovery dispute at hand.

[5]    Magistrate Judge Perkin's November 20, 2009 Memorandum and Order
so concluded, based on his determination that the Plan language in this case,
regarding "satisfactory proof" and "continued proof", is identical to the
language contained in the subject disability policies in Adams and Farina.
Magistrate Judge Perkin also noted that in both of those cases, LINA was the
defendant.  (Memorandum of United States Magistrate Judge Henry S. Perkin
dated November 20, 2009, at 6.)

Neither party objected to or sought appeal from Magistrate Judge
Perkin's determination that the applicable scope of review in this case is
de novo.  Accordingly, it is the law of this case, and I consider this case
under that standard.  See also Viera v. Life Insurance Company of North
America, 642 F.3d 407 (3d Cir. 2011).

1184 (3d Cir. 1991).  Thus, the district court is not limited to evidence before the plan administrator.  <u>Id.</u>

However, this does not require the district court to conduct an evidentiary hearing or a full trial <u>de novo</u>.  Rather, "[i]f the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a <u>de novo</u> review of the record of the administrator's decision, making its own independent benefit determination.  <u>Luby</u>, 944 F.2d at 1184-1185.

<u>Defendant's Objection</u>

As an initial matter, I address defendant's objection to the introduction of any evidence at trial beyond the jointly filed Administrative Record.

Defendant contends that, for purposes of this non-jury trial, evidence should be limited solely to the Administrative Record, which consists of the universe of information presented to defendant, as plan administrator, for determination of plaintiff's claim for long-term benefits.  In support of its position, defendant asserts that the goal of ERISA and the administrative review process set forth therein is to provide an expeditious review of benefit decisions, and to keep district courts from becoming substitute plan administrators.  <u>Donatelli v. Home Insurance Company</u>, 992 F.2d 763, 765 (8th Cir. 1993).

-8-

Defendant further asserts that by considering extra-Administrative Record evidence, this court would effectively become a substitute plan administrator, because I would be evaluating evidence which was not reviewed by LINA in determining plaintiff's claim.  It argues that ultimately, this court's role is to determine whether LINA made the right decision regarding plaintiff's claim, based on the information it had at the time.

Moreover, defendant contends that the Administrative Record contains sufficient evidence from which to determine plaintiff's claim.  Specifically, defendant avers that the Administrative Record is a sufficiently developed record, and is the result of plaintiff's two opportunities to provide documentation to LINA.  Defendant contends that plaintiff previously had ample opportunity to present documentation to LINA and should not be permitted to offer even further evidence in support of her claim.

Plaintiff contends that my March 18, 2011 Order denying both cross-motions for summary judgment should be construed as a determination that the Administrative Record was not, in fact, sufficient from which to enter judgment for either party.  Therefore, she asserts that this court is not constricted by the Administrative Record, and that additional evidence should be permitted.

As discussed above, the United States Court of Appeals for the Third Circuit has held that, in this context, de novo review means that my inquiry is not limited to, or constricted by, the administrative record.  Luby, 944 F.2d at 1184.  Thus, I am not limited to evidence before the plan administrator.  Id. However, I am not required to accept additional evidence; "[i]f the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a de novo review of the record of the administrator's decision" and make its own independent benefit determination.  Luby, 944 F.2d at 1184-1185.

Defendant relies on Luby for the proposition that where the record on review is sufficiently developed, the district court should not consider additional evidence.  Although I am mindful of ERISA's goal of an expeditious review of a benefit determination, see Donatelli, 992 F.2d at 765, I conclude that Luby does not prohibit me from considering additional evidence. Rather, Luby makes clear that where the record on review is sufficiently developed, the district court has discretion regarding whether to simply conduct a de novo review of that record, or whether to consider additional evidence.  Luby, 944 F.2d at 1184-1185.

In this case, I concluded in my March 18, 2011 Order that genuine issues of material fact existed which precluded entry of summary judgment for either party.  The issues

-10-

identified in that Order, while not limiting either party's ability to prove other issues at trial, included why plaintiff did not return to work in August or September 2009, and whether her inability to work with coworkers and her supervisor was caused by her disability.

Although I agree with defendant that the Administrative Record contains documentation relevant to those fact issues, I conclude that those fact question require credibility determinations for my <u>de novo</u> review of plaintiff's claim. Accordingly, I overrule defendant's objection, and I will consider the extra-Administrative Record evidence to the extent it is relevant.[6]

### FINDINGS OF FACT

1.   In 1999, plaintiff began employment with Mars, Inc.

2.   From 2003 until 2008, her position with Mars was as a Material Testing Senior Operator.[7]

---

[6]     In its formal written objection filed June 14, 2011, defendant also argues that extra-Administrative Record evidence would likely be irrelevant and prejudicial to defendant, and therefore should be excluded under Rule 402 of the Federal Rules of Evidence.  Moreover, it argues that the evidence would be "needlessly duplicative of the substantial evidence already in the record" and therefore excludable under Rule 403 of the Federal Rules of Evidence.  (Objection, page 5.)

     However, at trial, defendant did not pursue these arguments, and has identified no specific prejudice or ways in which the evidence offered by plaintiff is cumulative or duplicative of evidence already in the Administrative Record. Moreover, defendant did not articulate a specific relevance objection, other than its general averment that evidence outside of the Administrative Record should not be considered because it was not presented to LINA for determination of plaintiff's claim.

[7]     The Job Description for plaintiff's position as a Material Testing Senior Operator appears in the record at LINABAIR 0339-0341.

3.    The primary function of a Material Testing
      Senior Operator is to inspect and test cocoa
      beans.  Another primary function is to
      provide assurance that raw materials
      specifications are being met, and that only
      quality cocoa beans are being used.

4.    Accountabilities of the position include the
      analytical and sensory evaluation of incoming
      cocoa beans.  The Materials Testing Senior
      Operator has to make decisions and
      recommendations including analytical
      compliance and analytical audit plan, and to
      uncover potential problems based on data
      results.

5.    The job description for Materials Testing
      Senior Operator does not state that it is a
      job duty, requirement or right to work during
      certain preferred hours of the day, or to
      work only with certain co-workers or not work
      with certain co-workers.  Whether plaintiff
      likes or dislikes her co-workers is not a
      material duty of her position.

6.    Plaintiff was covered under a policy of
      insurance administered by LINA, known as
      Group Policy No. LK-422838 ("Policy").[8]  The
      Policy was effective on January 1, 1994 and
      has a policy rewrite date of August 1, 2001.
      The Policy is fully insured, that is, LINA
      both administers the Policy, and pays long-
      term disability benefits to disabled
      claimants under the Policy.

7.    Psychiatric medical records dated March 18,
      2008 indicate that plaintiff had been
      suffering from depression and anxiety on and
      off for years, including during her working
      years at Mars.  As of March 18, 2008, she was
      feeling particularly depressed because of
      problems with her job and her marriage.

_____

[8]    In addition to its inclusion in the administrative record at
LINABAIR 0118-0134, the Policy is attached to the Complaint as Exhibit A.

-12-

8.   Ms. Bair stopped working at Mars, Inc. on or
     about May 15, 2008.

9.   On May 15, 2008, plaintiff was hospitalized
     at Philhaven Hospital in Mt. Gretna,
     Pennsylvania, because of psychiatric
     problems.  She was under the care of Dr.
     Camelia Popa, M.D., a staff psychiatrist at
     Philhaven.

10.  Upon her admission at Philhaven, plaintiff
     had a Global Assessment of Function ("GAF")
     score of 25.  Her highest GAF within that
     past year was reported to be 70.  On
     admission, plaintiff reported increased
     stress, conflict at work and some family
     issues that added stress to her and her
     husband.

11.  Plaintiff's diagnoses at the time of her
     discharge from Philhaven on May 22, 2008
     included bipolar disorder type II,
     depression, and panic disorder with
     agoraphobia.  At discharge, plaintiff had a
     GAF score of 50.

12.  On May 23, 2008, plaintiff was re-admitted to
     Philhaven.  At that time, she reported
     expressing symptoms of depression,
     hopelessness, fatigue, decreased motivation,
     fleeting death wish, racing thoughts, chest
     pains, and paranoia.  Her stressors were
     reported to be job-related, marital strife,
     and strife in relationships.

13.  While in an acute partial program at
     Philhaven from May 23 to May 29, 2008, Ms.
     Bair was under the care of Dr. Kathryn R.
     Rexrode, Ph.D., and Dr. Jeremy Walters, M.D.,
     a staff psychiatrist at Philhaven.  During
     that time, it was reported that Ms. Bair
     admitted to having auditory and visual
     hallucinations which were much more extensive
     than she had disclosed in her previous
     admissions.

14. Ms. Bair's husband reported that she can be very paranoid, to the extent that she would close all the curtains in her house. Ms. Bair also stated that she would turn all the pictures in the house face down on a table so that she does not have them staring at her.

15. After seeing Dr. Walters on May 29, 2008, Ms. Bair was again admitted to the inpatient program at Philhaven because she reported a "high level of depression and anxiety and indicated that she was unsure if she could be safe that evening". She felt "increased depression and suicidal ideation" following a marital session with her husband where her husband asked her whether she was having an affair with a man at work, an accusation Ms. Bair denied.[9]

16. Plaintiff's diagnoses on discharge included bi-polar disorder type II, depression and panic disorder with agoraphobia.

17. At the time of her second admission, plaintiff's GAF was 30, and her discharge GAF was 60. Her highest GAF within that past year was reported to be 60, although it was reported to be 70 two weeks prior.

18. Plaintiff was prescribed psychotropic medication including Zoloft, Clonazepam and Seroquel.

19. Plaintiff's inpatient treatment at Philhaven ended on June 1, 2008. While there, she actively participated in therapeutic groups and activities, individual therapy sessions, and a joint therapy session with her husband and mother.

20. When she was discharged on June 1, 2008, plaintiff's mood had improved, she denied suicidal or homicidal ideation, she presented no psychotic symptoms, and she felt ready to leave the hospital.

---

[9]    LINABAIR 0252, 0255.

21. Starting on June 3, 2008, plaintiff attended a partial program at Philhaven for follow-up care.

22. Medical records submitted to LINA shortly thereafter exhibited plaintiff's particular dislike for her existing manager and two co-workers at Mars, describing them as "toxic".[10]  She indicated that those co-workers were a source of her "anxiety".[11]

23. She was discharged from the partial program on June 10, 2008, and at that time, her GAF score was 50.  Her highest GAF within the past year was then reported to be 64.

24. On July 21, 2008, plaintiff reported to her therapist, Karen Boyer, that she was "feeling relief" that "action may occur...for her to return to work part-time".[12]  As far as full-time work, plaintiff restated her belief that her new manager and two new employees had been very "toxic" to her emotional and physical health for about 11 months, but she believed she could work again "5:30 to 1 AM", that is, on a different shift than the new manager and the new employees.[13]

25. On July 29, 2008, plaintiff again discussed with Ms. Boyer her efforts to return to work, but indicated that her spouse was not supportive of her concerns about working with her old manager.

26. On August 1, 2008, plaintiff reported to Ms. Boyer with decreased anxiety, increased hopefulness, and a positive plan to "work out

_____

[10]   LINABAIR 0297.

[11]   LINABAIR 0293.

[12]   LINABAIR 0297.

[13]   LINABAIR 0297.

-15-

differences with employer/boss".[14]  Plaintiff reported to Ms. Boyer on August 2, 2008 that she had been meeting with individuals at Mars about modified shifts for her return to work.

27.  On August 15, 2008, plaintiff indicated not only a desire to return to work, but also a desire to take continuing education classes in the fall of 2008.  Specifically, plaintiff reported to Ms. Boyer that she had obtained a "greater clarity of her employment options and options for school (# of classes for fall).  Realizes she may have to find a part time job and take 1 course if modified work release does not get accepted."[15]

28.  Also on August 15, 2008, plaintiff reported to Ms. Boyer that her mood about returning to work had shifted from "they don't want me" to "I'm mad now".[16]  She told Ms. Boyer that "I've done everything to try to return to work."[17]  On August 19, 2008, plaintiff told Ms. Boyer that she was "ready to go back to day shift" at Mars.[18]

29.  By letter dated August 22, 2008, plaintiff's treating psychiatrist, Dr. Walters, released plaintiff to return to work with the initial restrictions of working three eight-hour days from 5:30 p.m. to 1:00 a.m. "to avoid triggers".[19]

30.  Specifically, Dr. Walters reported that he was treating Plaintiff for bi-polar disorder, and that in his opinion, she has depressive symptoms of that illness, including sleep

---

[14]    LINABAIR 0294-0295.

[15]    LINABAIR 0290.

[16]    LINABAIR 0290.

[17]    LINABAIR 0290.

[18]    LINABAIR 0289.

[19]    LINABAIR 0240.

-16-

disturbances, decreased motivation, variable concentration and decrease in stress tolerance.  Dr. Walters noted that plaintiff has difficulty in stressful situations and has certain triggers that result in decompensation.

31.  Dr. Walters stated:

> [I]f she is able to avoid or limit these stressors during the recovery period, she would have a better prognosis.  I had recommended three 8-hour days from 5:30 p.m. to 1:00 a.m.  This would allow her to return to work slowly and avoid triggers.  If she is able to manage the initial 3-day workweek, then she may be moved up to 5 days per week and as she recovers, her schedule may be extended further.  Subjecting Ms. Bair to emotional triggers would further delay recovery and could possibly require hospitalization - a stress neither Ms. Bair, her family, your company, nor this office would want.[20]

32.  By letter to plaintiff dated September 2, 2008, Mars, through Karen Grimaldi, R.N., sought clarification of Dr. Walters' August 22 letter.  Mars wanted additional information about the requested shift change and what the "stressful situations" and "emotional triggers" were for plaintiff so Mars could seek to avoid putting plaintiff in those situations.  Mars also voiced its concern about plaintiff's safety working "alone in a remote area of the plant in the middle of the night" if it accommodated her requested restrictions.  Mars also asked if plaintiff could work until 2:00 a.m. so she would work a full eight-hour shift.[21]

---

[20]     LINABAIR 0240.

[21]     LINABAIR 0260.

33. In the September 2, 2008 letter, Mars indicated that it might be willing to agree to plaintiff's request to restrict her working hours and job duties temporarily, as long as her healthcare provider provided the additional documentation substantiating that the restrictions would not pose a direct threat to plaintiff's health or safety.[22]

34. On September 12, 2008, plaintiff restated to Dr. Walters her desire to return to her job and voiced her concern that Mars was "not willing to comply [with her] request for work restrictions".[23]

35. By letter dated September 15, 2008, Dr. Walters responded to Ms. Grimaldi's September 2, 2008 letter.  He offered his professional opinion that plaintiff would, indeed, have the "ability to work 8 hour days from 5:30 pm to 2 am" and this would be "both appropriate and acceptable".  However, he refused to describe plaintiff's emotional triggers because those "issues are confidential and disclosure of these issues would itself be a trigger".  In the September 15, 2008 letter, Dr. Walters did not limit plaintiff to working three days a week.[24]

---

[22]     LINABAIR 0260-0261.  The September 2, 2008 letter also states that because the essential functions of plaintiff's job included performing "microtest and sensory release of beans", "[a]ll associates who are absent from work for any extended period of time for any reason, including illness or vacation, are required to recalibrate through side-by-side retraining with another lab technician for at least 1 or 2 weeks".  LINABAIR 0260.  The letter further states that this retraining must necessarily occur during the day, in the presence of other associates and the lab manager, and that if plaintiff were to restrict her hours to nighttime, she would be unable to recalibrate. Therefore, the letter indicates that if plaintiff were permitted to temporarily work transitional nighttime hours, her tasks during that time would likely be limited to "testing shell and nib samples, data analysis and preliminary beans testing".   LINABAIR 0261.

[23]     LINABAIR 0246.

[24]     LINABAIR 0241.

36. On September 23, 2008, Dr. Walters filled out a status form for LINA in which he asserted that plaintiff was "not stable to return to full or part time work currently".[25]  Under the heading "Ability to Perform", Dr. Walters indicated that plaintiff was not able to be without face-to-face contact for extended periods of time, that is, she could not work alone or in isolation.[26]

37. Dr. Walters' September 23, 2008 report states that plaintiff's current GAF was 50 and that her highest GAF in the past year was 52.

38. Ultimately, Mars advised plaintiff by letter dated October 1, 2008 that it had concluded it was unable to accommodate plaintiff's work preferences because Dr. Walters would not identify what "stressors" and "triggers" she needed to avoid, and therefore Mars could not truly determine if it could accommodate plaintiff's proposed restrictions.[27]

39. Mars further indicated that when Mars asked Dr. Walters for clarification regarding his proposed restrictions and for additional information regarding what "stressful situations" and "emotional triggers" plaintiff should avoid when she returned to work, Dr. Walters did not disclose further information for confidentiality reasons and because disclosure would be an emotional trigger in and of itself, and he did not address of all of Mars' concerns about plaintiff working alone in a remote area of the plant at night.

40. Mars explained that the information from plaintiff's healthcare provider was "insufficient to establish that returning to work under these circumstances is a reasonable accommodation that will not pose a

---

[25]   LINABAIR 0314-0316, at 0315.

[26]   LINABAIR 0316.

[27]   LINABAIR 0262.

-19-

threat to your health or will overcome the
undue burdens imposed on the business and
other associates" and that "[c]onsequently,
the Company is unable to accommodate your
restrictions".[28]

## Plaintiff's Claim for Long-Term Disability Benefits

41. Plaintiff filed a claim for long-term
disability ("LTD") benefits on October 7,
2008.[29]

42. By letter dated November 4, 2008, LINA denied
plaintiff's claim ("denial letter").  The
denial letter asserted that plaintiff had not
provided "medical documentation to support an
impairment of functional capacity severe
enough to affect [plaintiff's] ability to
work throughout the Benefit Waiting
Period."[30]  That is, LINA concluded that she
had not provided satisfactory proof that she
was disabled throughout the entire 180-day
Benefit Waiting Period.

43. The denial letter also stated that as of
October 29, 2008, plaintiff exhibited "low
intensity of symptoms", had "no psychosis",
had no suicidal ideation or homicidal
ideation and no "disinhibited behaviors", and
was caring for a young child.  LINA concluded
that plaintiff's restrictions and limitations
were not supported by the medical information

---

[28]     LINABAIR 0262.

[29]     According to the October 1, 2008 letter, Mars permitted plaintiff
to remain on medical leave as an accommodation instead of agreeing to the
accommodations she requested, and indicated that she would continue to be
compensated under the company's short-term disability ("STD") policy.  The
letter also indicates that as of October 1, 2008, plaintiff had used 16 weeks
of the total 26 weeks of paid medical leave for which she was eligible under
the STD policy, and that her remaining 10 weeks of STD benefits would expire
on November 13, 2008.

[30]     LINABAIR 0145.

on file and that her conditions were "not
conducive with global functioning
impairments."[31]

44.  On November 11, 2008, plaintiff appealed the
     denial of her claim.

45.  On December 15, 2008, Dr. Walters referred
     plaintiff to the "Day program" at Philhaven.

46.  On December 18, 2008, Mars terminated
     plaintiff's employment.

47.  On January 5, 2009, Dr. Walters indicated
     that plaintiff's depression "was triggered by
     issues at work and it has continued", that
     she has "difficulty functioning at home and
     has even had difficulty caring for her son
     without her husbands [sic] support", she has
     "self-harm thoughts but has been able to
     contract for safety", she is "on several
     medications but they have had limited
     benefit", the need to have her "return to a
     day program is growing", and at "this time I
     do not believe that she is ready for work and
     needs continued treatment".[32]

48.  On January 11, 2009, a peer-review physician,
     Dr. Stuart Shipko, M.D., reviewed plaintiff's
     medical records and concluded that
     information contained therein was
     "insufficient to support [plaintiff's]
     continuous disability for the time period of
     5/15/08 to 11/10/08".[33]

49.  In support of his conclusion, Dr. Shipko
     noted that plaintiff was "unable to work from
     5/15/08 until about July 21, 2008", but then

---

[31]     LINABAIR 0145.

[32]     LINABAIR 0367.  Dr. Walter's January 5 letter is dated, apparently
mistakenly, "January 5, 2008".  However, a review of the letter reveals that
it was written in response to a December 22, 2008 letter from plaintiff's
counsel to Dr. Walters, and the parties agree that it should be dated
January 5, 2009.

[33]     LINABAIR 0183-0190.

"she aggressively began to make arrangements
to return to work, but at a shift where she
would not have to confront her prior manager
and 2 other [co-workers]".  Therefore, Dr.
Shipko concluded that plaintiff was capable
of returning to work in her "usual occupation
as of July 21, 2008 but did not go back
because of a conflict with coworkers".[34]

50.  Although Dr. Shipko's report notes that a Dr.
     Coica reported that plaintiff's GAF score was
     52 as of March 18, 2008, he did not consider
     whether someone with a GAF score of 52 was
     capable of performing the job duties of
     plaintiff's position at Mars.  Dr. Shipko did
     not contextualize his findings in terms of a
     GAF score.

51.  Dr. Shipko found that Dr. Walters' attempt to
     release plaintiff first to part-time work
     with restrictions and then full-time with
     restrictions was inconsistent with Dr.
     Walters' statement that plaintiff was unable
     to work on September 23, 2008.  He also
     indicated that plaintiff's "intact
     occupational functionality" was supported by
     the letters from Dr. Walters requesting
     plaintiff's return to work with
     accommodations.[35]

52.  Moreover, Dr. Shipko's report noted that
     plaintiff indicated in a questionnaire in the
     claim file that she was "not able to work
     around 'other people,' but the actual record
     indicates that this was not a general problem
     with all people but a specific problem with
     her manager and 2 other coworkers".  He
     further indicated that plaintiff's "reported
     restriction of not being around her manager

---

[34]    LINABAIR 0183-0190.

[35]    LINABAIR 0189.  Although Dr. Shipko's report refers to the
"8/22/08 and 9/13/08 letters from Dr. Walters", presumably he was referring to
the August 22, 2008 and September 15, 2008 letters.

and 2 other employees, whom she perceived as
toxic, is not a factor of global
impairment".[36]

53. Dr. Shipko also called and directly spoke
with Dr. Walters on January 12, 2009.  Dr.
Shipko and Dr. Walters together reviewed a
record from July 21, 2008 where plaintiff
reported that she could return to work at
Mars, but not with the same manager and
employees.  According to Dr. Shipko, "Dr.
Walters concurred that the claimant would
have been capable of returning to work with
different coworkers around that time.  He
went on to say that she seemed to deteriorate
in late October 2008 when she was not
accommodated in her request to return to work
in the last shift....".[37]

54. That same day, Dr. Shipko sent a summary of
his conversation to Dr. Walters and asked Dr.
Walters to fax the summary back with any
changes.  Dr. Shipko advised Dr. Walters that
if he elected not to respond, "the insurer
may rely on this summary in its current
form."[38]

55. There is no evidence in the record that Dr.
Walters returned the summary or made any
changes to it.

56. On January 21, 2009, after considering Dr.
Shipko's independent review of plaintiff's
records, LINA affirmed its denial of
plaintiff's claim for long-term disability
benefits.

57. Plaintiff initiated this lawsuit on
February 9, 2009.

---

[36]   LINABAIR 0189-0190.

[37]   LINABAIR 0188.

[38]   LINABAIR 0191.

LINA's Review of Additional Medical Records

58.  In July 2009, it was discovered that in early January 2009, during the original review of plaintiff's long-term disability appeal, plaintiff's counsel, Kirk L. Wolgemuth, Esquire, had sent supplemental medical information regarding plaintiff to LINA, but at an incorrect mailing address.[39]

59.  There is no dispute that plaintiff's counsel sent the records to the incorrect address, and that the records were therefore never received by LINA up until that point in time. Despite this error, which was no fault of LINA's, and although the review by this point was past the administrative appeal deadline, LINA voluntarily agreed to re-evaluate plaintiff's appeal and take this supplemental information into account.

60.  As part of this voluntary re-evaluation, LINA requested additional information from plaintiff and forwarded the supplemental medical information to Dr. Shipko, the same psychiatrist who conducted the prior file review and peer-to-peer consult with plaintiff's treating physicians, for his review and evaluation.

61.  In his report dated July 21, 2009, Dr. Shipko noted that the supplemental medical information indicated that plaintiff's "condition deteriorated and she has impairment that precludes occupational functionality from 12/9/08 to 1/12/09." However, Dr. Shipko also reiterated that "[t]he information still indicates that the claimant was capable of returning to work by 7/21/08 as there has been no new information provided relevant to that time period."[40]

_____

[39]    Specifically, the records were addressed to Patti Ursiny, LINA Appeal Claim Manager, but they were sent to an incorrect post office box number.  Therefore, the records were never received by LINA.

[40]    LINABAIR 0380-0381.

62. Taking plaintiff's supplemental medical
    information and Dr. Shipko's supplemental
    review of plaintiff's records into account,
    LINA affirmed its previous denial of
    plaintiff's long-term disability claim by
    letter dated July 31, 2009.

63. LINA concluded that although plaintiff's
    "condition may have deteriorated on
    December 9, 2008, the information provided is
    insufficient to support continuous disability
    for the time period of May 15, 2008 through
    November 10, 2008" and, therefore, plaintiff
    "did not fulfill her Benefit Waiting period
    and does not meet the definition of
    disability" under the Policy.[41]

64. LINA made no attempt to determine what
    plaintiff's GAF score was at any point from
    May 15, 2008 through the expiration of the
    Benefit Waiting Period in November 2008.
    LINA also made no attempt to determine
    whether plaintiff could perform the material
    duties of her occupation with a GAF of 50.[42]

65. Appeals Manager Patti Ursiny testified at her
    January 6, 2010 deposition that she had no
    discussions with Dr. Shipko or anyone else
    regarding plaintiff's ability to work with a
    GAF of 50, and that she does not know whether
    an individual with a GAF of 50 would perform
    the duties of a Material Testing Senior
    Operator.[43]

---

[41]    LINABAIR 0384-0386.

[42]    Defendant admits that LINA did not attempt to determine
plaintiff's GAF scores or whether she could perform the duties of her job with
a GAF of 50.  However, as discussed below, defendant contends that it had no
such obligation.

[43]    Excerpts of Patti Ursiny's deposition were admitted into evidence
at trial as Plaintiff's Exhibit 2, and were read into the record by plaintiff.
In its case-in-chief, defendant read counter-designated portions of the
deposition into the record.

66. Ms. Ursiny also testified at her January 6, 2010 deposition that isolating, cutting, and having auditory and visual hallucinations are examples of disinhibited behavior, and that it would be relevant to know if plaintiff's conflict with her co-workers was caused by her mental illness.  Ms. Ursiny also testified that she never requested a psychiatric independent medical evaluation for an individual with a mental illness.

<u>CONCLUSIONS OF LAW</u>

Applying my factual findings to the standard of review applicable to this ERISA case, I make the following conclusions of law.

1. The Policy was effective on January 1, 1994 and has a policy rewrite date of August 1, 2001.

2. The Policy is fully insured.  That is, LINA both administers the Policy and pays long-term disability benefits to disabled claimants under the Policy.

3. LINA agrees to pay disability benefits to a Mars "Associate" who becomes disabled while covered by the Policy.

4. As an Associate, it was Ms. Bair's duty to provide "Satisfactory Proof" of her disability to LINA.

5. Under the Policy, LINA will not begin paying long-term disability benefits to a disabled employee until that employee first has been continuously disabled for a period of 180 days ("Benefit Waiting Period").

6. Plaintiff alleges that her mental illness rendered her disabled, for purposes of the Policy, on May 15, 2008.

7.    Therefore, to satisfy the Benefit Waiting Period, plaintiff needed to provide "satisfactory proof" that she was continuously disabled from May 15, 2008 through November 11, 2008 (180 days).

8.    Plaintiff has not established that she was continuously disabled during the Benefit Waiting Period, that is, from May 15, 2008 through November 11, 2008.

9.    Plaintiff was able to return to work as early as July 21, 2008 on a modified schedule and was ready to return to work on her usual schedule on August 19, 2008.

10.   Plaintiff's GAF score of 50 on September 23, 2008 is not indicative of her functioning on other dates during the relevant time period.

11.   Plaintiff's ability to return to work and perform all of the material duties of her own job during that time renders her not "totally disabled" for purposes of the Policy throughout the entire Benefit Waiting Period.

12.   Accordingly, plaintiff has not established that she is entitled to benefits under the Policy.

<u>CONTENTIONS OF THE PARTIES</u>

<u>Contentions of Plaintiff</u>

Plaintiff contends that she is entitled to summary judgment and that this court, reviewing the administrative record of this matter, should reverse the Policy administrator's denial of her claim for long-term benefits. In support of her argument, plaintiff contends that LINA selectively considered the medical evidence and improperly relied on the paper-review reports of its experts while giving scant weight to plaintiff's treating

-27-

psychiatrist, Dr. Walters, and arbitrarily refused to credit plaintiff's reliable evidence.

Specifically, plaintiff avers that in its November 4, 2009 denial of her claim, LINA ignored the medical evidence presented by Dr. Walters.  Instead, plaintiff contends, LINA relied on Dr. Rosenthal's conclusion that plaintiff's requested limitations and restrictions were not supported by her medical records.

Plaintiff further asserts that LINA failed to explain why it disregarded Dr. Walters' opinions that plaintiff had a GAF score of 50, was completely disabled, and was unable to work. Plaintiff also avers that LINA's decision did not explain how plaintiff would be able to perform her job without the restrictions imposed by Dr. Walters.

Regarding LINA's denial of plaintiff's appeal, plaintiff contends that Dr. Shipko erred in concluding that Dr. Walters' September 23, 2008 report was inconsistent with his earlier request for her to return to work with accommodations. Specifically, plaintiff avers that it was not inconsistent for Dr. Walters to recommend that plaintiff attempt to return to work with restrictions, first on a part-time basis and then on a full-time basis, but also find that she could not return to work in her regular position without the restrictions.

Plaintiff also contends that her illness caused her perception that her co-workers were toxic, and suggests that Dr. Shipko incorrectly characterized this as a personality problem with her manager and two co-workers.  Moreover, plaintiff avers that Dr. Shipko did not address the fact that plaintiff had a GAF of 50, and she asserts that such a GAF score would be a serious impairment in her occupational functioning.  Plaintiff asserts that Dr. Shipko's opinion is not credible or competent because he did not personally evaluate her.

Regarding the Benefit Waiting Period, plaintiff contends that even if she had returned to work full-time with restrictions or part-time without restrictions in August 2008, she would not have been considered "actively at work" under the terms of the Policy.  Therefore, according to plaintiff, the Benefit Waiting Period time would continue to accrue during that time.  She also contends that the reason she did not return to work at that time was that Mars did not accommodate the restrictions imposed by Dr. Walters.

Finally, plaintiff contends that she was unable to perform the essential duties of her job, because a requirement of the Material Testing Senior Operator position was the ability to work with co-workers.  She avers that Dr. Walters attempted to release her to return to work as long as she did not have contact with her co-workers, but that Mars could not accommodate her.

-29-

<u>Contentions of Defendant</u>

Defendant contends that it is entitled to summary judgment in its favor for four reasons.  First, it avers that plaintiff did not provide sufficient evidence that she was continuously disabled throughout the entire applicable waiting period of May 15, 2008 through November 11, 2008.  Specifically, defendant avers the record before LINA at the time, and before this court now, unequivocally indicates that plaintiff was emotionally ready, medically cleared, and actively attempting to return to work at her own job at Mars from at least July 2008 through September 2008.

Defendant also asserts that the restrictions proposed by Dr. Walters (<u>i.e.</u>, for plaintiff to work during certain hours of the night, remotely, and with only certain people) are preferences, but are not "material duties of her own job" for purposes of the Policy's definition of "total disability".  Moreover, defendant avers that neither Dr. Walters nor Ms. Boyer ever suggested that plaintiff could not perform the physical and mental requirements of a Materials Testing Senior Operator when she returned to work.

Defendant argues that this conclusion is supported by the determinations of Dr. Shipko, an independent psychiatrist, who reviewed plaintiff's medical records and spoke to Dr. Walters.  Dr. Shipko concluded that plaintiff was able to return

-30-

to work in her usual occupation as of July 21, 2008, but did not go back because of a conflict with co-workers.  Defendant contends that Dr. Shipko's report indicates that plaintiff's subjective preference not to work with particular people is not objective medical evidence of a disability.

Thus, defendant asserts that there is objective medical evidence indicating that plaintiff was not continuously disabled throughout the Benefit Waiting Period.  Defendant avers that Dr. Walters implicitly confirmed this conclusion by failing to return Dr. Shipko's summary with any changes.

Second, defendant avers that aside from the Benefit Waiting Period issue, LINA denied the claim because plaintiff had not provided satisfactory proof of her disability as of October 29, 2008.  Specifically, defendant contends that plaintiff had low intensity of symptoms, no psychosis, no suicidal or homicidal ideation, no "disinhibited behaviors", and was capable of caring for her child.

Moreover, defendant contends that plaintiff's treating physician had recommended a gradual return to work.  Defendant further contends that plaintiff's GAF score is not a static value, but is a subjective measure of an individual's function at the particular time of evaluation.  Defendant also avers that plaintiff discusses her GAF scores only when they were at their

lowest ebb, and does not discuss her GAF scores from mid June through mid September 2008 (during the Benefit Waiting Period).

Defendant also asserts that it voluntarily agreed to re-evaluate plaintiff's claim in July 2009 after learning that plaintiff's counsel had attempted to send supplemental medical information in January 2009.  Defendant avers that upon review of the information, Dr. Shipko concluded that plaintiff's condition had deteriorated and her impairment precluded occupational functionality from December 9, 2008 to January 12, 2009. However, he also concluded that the evidence still indicated plaintiff was capable of returning to work by July 21, 2008. Therefore, LINA reaffirmed its previous denial of plaintiff's claim because the information provided was insufficient to support continuous disability from May 15, 2008 through November 10, 2008, and thus plaintiff did not meet the definition of disability under the Policy.

Third, defendant contends that it considered all medical evidence in the record when making its decision.  In support of this assertion, defendant relies on the deposition of Patti Ursiny for the proposition that LINA considers a claimant's occupation, job, disability, and eligibility for benefits.

Finally, defendant avers that Dr. Shipko's independent psychiatric evaluation should be given great weight because he considered all of plaintiff's psychiatric evaluations.  Moreover,

-32-

in response to plaintiff's argument that her treating physician's opinion should be given greater weight than Dr. Shipko's opinion, defendant notes that Dr. Shipko and Dr. Walters were in agreement that plaintiff could have returned to work in July 2008, thus, there was no reason for Dr. Shipko to examine plaintiff personally.

<u>RELEVANT POLICY PROVISIONS</u>

The Policy provides, in its Description of Benefits, as follows:

> **Monthly Benefits**
> The Insurance Company will pay Monthly Benefits if an Associate becomes Totally Disabled while covered under this Policy.  A Totally Disabled Associate must satisfy the Benefit Waiting Period and be under the care of a Physician. Satisfactory proof of Total Disability must be provided to the Insurance Company, at the Associate's expense, before benefits will be paid.
>
> The Insurance Company will require continued proof of the Associate's Total Disability for benefits to continue.
>
> **Benefit Waiting Period**
>
> The Benefit Waiting Period is a continuous period of time an Associate is not in Active Service due to disability before Monthly Benefits may be payable.  The Benefit Waiting Period is shown in the Schedule of Benefits.

(Policy, LINABAIR 0125.)

In its schedule of benefits, the Policy also provides, in relevant part:

### Definition of Total Disability/Totally Disabled

An Associate is Totally Disabled if,

1. during the first 24 months after benefits commence, that due to Injury or Sickness, and independent of any other causes, he or she is unable to perform all the material duties of his or her own job with the Employer and provides objective medical information confirming that he or she is Totally Disabled; and

2. after benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, and solely due to Injury or Sickness, he or she is unable to earn more than 75% of his or her Indexed Annual Earnings.

....

### Benefit Waiting Period

180 consecutive days of an eligible Associate being disabled who is not actively at work due to Injury or Sickness.

....

If, during the Benefit Waiting Period, a disabled Associate returns to work on other than a full-time basis either with or without restrictions, or returns to work on a full-time basis with restrictions, he or she will not be considered in Active Service and the Benefit Waiting Period shall continue to be counted during this period of employment.

(Policy, LINABAIR 0121-0122).

-34-

DISCUSSION

Defendant's Motion for Judgment on Partial Findings

On the first day of trial, at the close of plaintiff's case-in-chief, defendant moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. Although I heard oral argument on defendant's motion on the second day of trial, I deferred my ruling on it until after the close of evidence, as permitted by Rule 52(c). At the close of evidence, I took the matter under advisement.

Rule 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed.R.Civ.P. 52(c).

"In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of trial." EBC, Inc. v. Clark Building Systems, Inc., 618 F.3d 253, 272 (3d Cir. 2010). Therefore, in evaluating a Rule 52(c) motion, the court "does not view the evidence through a particular lens or draw inferences favorable to either party." Id. Moreover, the

court may evaluate the credibility of witnesses where appropriate.  Id.

In support of its motion, defendant contends that the evidence presented in plaintiff's case-in-chief fails to establish that plaintiff was unable to perform all of the material duties of her own job from May 15, 2008 through November 11, 2008 and that, therefore, she did not provide satisfactory proof of total disability throughout the applicable waiting period.  Therefore, defendant contends that plaintiff has not satisfied her burden of proving her entitlement to long-term disability benefits under the Plan.

Specifically, defendant contends that the evidence, including the administrative record which was admitted into evidence as the parties' Joint Exhibit 1, confirms that Ms. Bair was able, prepared, and intending to work and perform her job duties during the Benefit Waiting Period.  Defendant contends that she was able to perform the essential duties of her own job in at least July and August 2008, but that she did not return because she wanted to work a different shift and with different people.  Defendant avers that those are not job duties, but job preferences which are not relevant to a determination of "total disability" for purposes of her long-term disability eligibility.

Defendant also contends that plaintiff's testimony establishes that she has suffered from anxiety, depression and

-36-

mental illness for approximately 20 years, since the age of 13 or 14, when she was first hospitalized.  LINA also asserts that plaintiff has worked consistently for Mars for several years despite her condition.

Defendant avers that plaintiff's episode of depression during the relevant time period was triggered by job stress and trouble with coworkers and her manager, rather than her mental illness rendering her unable to work.  Moreover, defendant contends that on July 21, 2008, plaintiff reported to her therapist, Karen Boyer, that she was feeling relief and that action may occur for her to return to work full-time.  Thus, although acknowledging plaintiff's admirable struggle with her mental illness, defendant avers that the record demonstrates plaintiff's ability to return to work in July 2008.

Plaintiff responds that her illness caused her to perceive trouble with her coworkers and that the problem was with her, not with her coworkers.  She contends that this conclusion is supported by Dr. Walters' April 18, 2011 letter in which he states that her illness "led to her inability to work and prompted the subsequent request for special accommodations."[44]

Moreover, plaintiff contends that LINA failed to fully consider her GAF scores during the relevant time period.  For example, she argues that Dr. Shipko, LINA's peer-review

---

[44]     Plaintiff's Exhibit 1.

physician, did not comment on the GAF scores found by Dr. Walters.  Plaintiff also asserts that Patti Ursiny, LINA's claims adjuster, had no idea whether an individual with a GAF of 50 could perform the job duties of a materials testing operator. Therefore, plaintiff contends that defendant failed to fully consider whether plaintiff was capable of performing the essential duties of her job.

Pursuant to the Policy, LINA agrees to pay disability benefits to a Mars employee who becomes disabled while covered by the Policy.  It is the employee's duty to provide "satisfactory proof" of disability to LINA.  An employee is "totally disabled" if she is "unable to perform all the material duties of his or her own job with the Employer and provides objective medical information confirming that he or she is Totally Disabled". (Policy, LINABAIR 0121-0122).

Here, plaintiff alleges that she suffered an injury and became disabled, as defined by the Policy, on May 15, 2008. The parties agree that under the terms of the Policy, plaintiff was subject to a 180-day Benefit Waiting Period from May 15, 2008 through November 11, 2008.  That is, as a first step to receiving long-term disability benefits under the Policy, plaintiff needed to be continuously disabled from May 15, 2008 through November 11, 2008, and to provide satisfactory proof of such continuous disability to LINA.

-38-

<u>Benefit Waiting Period</u>

Plaintiff contends that she was continuously disabled during the applicable Benefit Waiting Period, that is, from May 15, 2008 through November 11, 2008.  Defendant contends that it properly concluded she was not, because plaintiff's treating psychiatrist, Dr. Walters, and defendant's peer-review psychiatrist, Dr. Shipko, were in agreement that she was capable of returning to work as of about July 21, 2008.  Plaintiff contends that because Dr. Walters recommended her return to work only with certain restrictions, she remained continuously disabled during that time.

I find that on July 21, 2008, plaintiff reported to her therapist, Karen Boyer, that she was "feeling relief" that "action may occur...for her to return to work part-time".[45]  She also restated Ms. Boyer her belief that her new manager and two new employees had been very "toxic" to her emotional and physical health for about 11 months, but she believed she could work again on a different shift than the new manager and the new employees, specifically, she believed she could work from 5:30 o'clock p.m. to 1:00 o'clock a.m.

By letter dated August 22, 2008, Dr. Walters recommended that plaintiff "return to work slowly and avoid triggers" by working three eight-hour days per week on the

---

[45]     LINABAIR 0297.

5:30 o'clock p.m. to 1:00 o'clock a.m. shift.  He further indicated that "[i]f she is able to manage the initial 3 day work week, then she may be moved up to 5 days per week" and extended further as she recovers.[46]  In a follow-up letter dated September 15, 2008, Dr. Walters stated that it was "both appropriate and acceptable" for Ms. Bair to work eight-hour days from 5:30 o'clock p.m. to 2:00 o'clock a.m.[47]

Plaintiff argues that Dr. Walters' August 22, 2008 and September 15, 2008 letters demonstrate that plaintiff was unable to fulfill her regular job duties at that time, noting that Mars required plaintiff to "recalibrate" during a day shift before returning to her usual duties.  However, this contention is contradicted by plaintiff's statements to her therapist in August 2008.  Moreover, the record does not demonstrate that plaintiff was unable to perform "recalibration" during a day shift.

Specifically, through mid-August 2008, Ms. Bair continued to report to Karen Boyer her desire to return to work, including a positive plan to "work out differences with employer/boss".[48]  She told Ms. Boyer that she had "done everything to try to return to work."[49]  Indeed, on August 19,

---

[46]     LINABAIR 0240.

[47]     LINABAIR 0241.

[48]     LINABAIR 0294-0295.

[49]     LINABAIR 0290.

-40-

2008, plaintiff told Ms. Boyer that she was "ready to go back to day shift" at Mars.[50]

Moreover, neither Dr. Walters' August 22, 2008 letter nor his September 15, 2008 letter specifically states that plaintiff was unable to return to work in her regular capacity during the day shift.  Rather, he "recommended" the modified schedule in order to avoid unspecified triggers, and characterized the modified schedule as "both appropriate and acceptable", but did not characterize the proposed modifications as necessary.[51]

Dr. Walters did not identify any specific triggers to which plaintiff would be subjected if she were to return to work in her usual capacity.  Moreover, Ms. Bair testified at trial that Dr. Walters had not said she could not perform her job duties.[52]  There is no evidence in the record that plaintiff was unable to inspect and test cocoa beans; provide assurance that raw materials specifications are being met, and that only quality cocoa beans are being used; make decisions and recommendations including analytical compliance and analytical audit plan; or

---

[50]     LINABAIR 0289.

[51]     This factual finding is bolstered by Ms. Bair's trial testimony, in which she stated: "My doctor thought a period – a transitional period would be good for me to get back into working around other people".  N.T. 7/7/11 at 25.

[52]     N.T. 7/7/11 at 42.

uncover potential problems based on data results, as required by her Job Description.[53]

Thus, I find that plaintiff wished to return to work in her regular capacity, albeit during different hours, as early as July 21, 2008, and that she believed she was ready to return to her regular shift on August 19, 2008.  Although Dr. Walters recommended that she return to work initially on a modified schedule, he did not indicate that she was unable to return to work in her usual capacity.

Because this period of time was within the applicable Benefit Waiting Period, plaintiff's ability to return to work and perform all of the material duties of her own job during that time renders her not "totally disabled" for purposes of the Policy.

Plaintiff's contention that LINA erred in concluding she was not totally disabled throughout the Benefit Waiting Period is based in large part on her contentions regarding GAF scores.  Specifically, plaintiff asserts that Dr. Shipko's opinion is flawed because he never determined Ms. Bair's GAF score, and that he could not have determined her GAF score because he never examined her.  She also contends that Dr. Walters' determination that her GAF score was 50 in September 2008 indicates that she was incapable of working.

---

[53]     LINABAIR 0339-0341.

A Global Assessment of Functioning rating, or GAF rating, "is a subjective determination of the physician's judgment (on a 100-point scale) of the claimant's overall ability to function on that particular day, excluding physical and environmental impairments." Long v. Astrue, 2009 WL 5033973, at *1 n.1 (E.D.Pa. Dec. 21, 2009)(Pollak, S.J.)(citing Diagnostic and Statistical Manual of Mental Disorders IV-TR ("DSM-IV"), at 34 (4th ed. 2000).  A GAF score of 50 "indicates a serious impairment in social and occupational functioning." Escardille v. Barnhart, 2003 WL 21499999, at *2 (June 24, 2003) (Giles, C.J.)(citing DSM-IV at 34).

However, "a GAF score is a subjective scale that only reflects an individual functioning at a particular moment in time." Porter v. Astrue, 2008 WL 4707541, at *4 (M.D.Pa. Oct. 23, 2008).  See also Burley v. Barnhart, 2005 WL 2212363, at *1 (E.D.Pa. Sept. 9, 2005)(Sanchez, J.).  Thus, plaintiff's GAF score at a particular time, while reflecting her individual functioning at that time, does not reflect her functioning at another time.

Therefore, I conclude that although plaintiff's GAF score on September 23, 2008 was 50 as reported by Dr. Walters on that date,[54] that score is not indicative of her functioning on other dates during the relevant time period.  Dr. Walters'

---

[54]     LINABAIR 0314.

September 23, 2008 report also states that plaintiff's highest GAF score in the past year was 52.

However, the record does not indicate plaintiff's GAF score on July 21, 2008, when she reported to Karen Boyer that she was ready to return to work, or on August 19, 2008, when she reported that she was ready to return to the day shift. Accordingly, I conclude that plaintiff's GAF score in September 2008 does not establish that she was unable to return to work in July or August 2008.

Moreover, to the extent plaintiff suggests that her GAF score on a given day is nevertheless indicative of her ability to work on other days, plaintiff's contention that her GAF score of 50 in September 2008 indicates that she was entirely "incapable of working"[55] is belied by Dr. Walters' September 15, 2008 letter indicating that it was both appropriate and acceptable for plaintiff to work eight-hour days from 5:30 p.m. to 2:00 a.m.

Finally, Dr. Walters and Dr. Shipko were in agreement that plaintiff was able to return to work as of approximately July 21, 2008.[56]  Although Dr. Walters recommended a modified work schedule, in part so that plaintiff could work with different coworkers, he did not identify the specific "triggers" which the modifications sought to avoid, and, as discussed above,

---

[55]    Plaintiff's Brief in Support of Proposed Findings of Fact and Conclusions of Law (Document 84), page 22.

[56]    LINABAIR 0191.

-44-

he did not characterize the proposed modifications as necessary.[57]

I conclude, therefore, that plaintiff has not established that she was continuously disabled during the Benefit Waiting Period, that is, from May 15, 2008 through November 11, 2008.  It is clear from the record of this matter, including plaintiff's trial testimony, that plaintiff has suffered serious illness for much of her life, including during the relevant period.  However, she has not established that she was unable to perform the material duties of her own job throughout the entirety of the Benefit Waiting Period.

Accordingly, I grant defendant's motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, and I enter judgment in defendant's favor and against plaintiff.

---

[57]     The evidence at trial includes an April 18, 2011 letter from Dr. Walters to plaintiff's counsel.  It states, in relevant part, that "[plaintiff's] illness limits her capacity to function.  It was her illness which led to her inability to work and prompted the subsequent request for special accommodations."

As discussed above, because the standard of review applicable to this case is de novo, I am permitted to consider evidence beyond the Administrative Record.  Luby, 944 F.2d at 1184.  Therefore, I have considered Dr. Walters' April 18, 2011 letter.  However, I conclude that, in light of the other evidence in the record, the letter does not establish that plaintiff was continuously disabled during the Benefit Waiting Period.

It is clear from the record that plaintiff's illness has limited her capacity to function, as Dr. Walters' letter states.  However, although his letter generally states that plaintiff was unable to work, it does not demonstrate that throughout the entire Benefit Waiting Period, she was continuously unable to perform the material duties of her job.  Therefore, the April 18, 2011 letter does not refute my conclusion that there were times during the Benefit Waiting Period when plaintiff was ready and able to return to work.

CONCLUSION

For all the foregoing reasons, I overrule defendant's Statement of Objection to the Admissibility of Any Evidence Beyond the Administrative Record of Defendant Life Insurance Company of North America. I grant defendant's motion for judgment on partial findings, and I enter judgment in favor of defendant Life Insurance Company of North America and against plaintiff Melinda Bair.